# In the United States Court of Federal Claims

No. 25-1688
Filed: April 1, 2026
Re-issued: April 28, 2026[1]

|  |  |
|---|---|
| JOERNS HEALTHCARE, LLC, | ) |
|  | ) |
| *Plaintiff,* | ) |
|  | ) |
| v. | ) |
|  | ) |
| THE UNITED STATES, | ) |
|  | ) |
| *Defendant* | ) |
|  | ) |
|  | ) |

*Aron Beezley*, Bradley Arant Boult Cummings LLP, Washington, D.C., for Plaintiff.

*Thomas J. Adair*, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, for Defendant. *Laura B. Reass*, Office of General Counsel, U.S. Department of Veteran Affairs, *of counsel*.

## OPINION AND ORDER

This case primarily calls upon the court to determine what the Department of Veterans Affairs ("VA") meant when it solicited hospital beds with a "minimum" width of 36 inches and others that could extend to "at least" 42 inches wide. The solicitation also made clear that bed dimensions would be verified with a tape measure to ensure compliance, with no indication that variation from the minimum requirements would be acceptable. In fact, failing to meet minimum dimensions would result in the offer being deemed non-responsive and excluded from further consideration. The answer seems obvious enough; words have meaning after all.

Unhappy with its exclusion from the competition because the beds it submitted for evaluation failed to meet both width requirements, Joerns Healthcare, LLC contends the language was not so clear when viewed through the lens of industry practices. To Joerns, industry practices led it to believe that the VA did not really mean 36 inches or 42 inches. Joerns

---

[1] The court initially issued this opinion and order under seal and directed the parties to confer and propose redactions pursuant to the protective order. The parties have jointly proposed redactions that the court adopts with the following notation: "[ * * * ]". The court also made one typographical correction to avoid ambiguity by capitalizing one instance of a defined term that was inadvertently not capitalized in the original version of this opinion. *See* RCFC 60(a).

contends that, in the hospital bed market, beds within an inch of the stated dimensions are acceptable. There are several problems with this belief. First, it is not a reasonable interpretation of the solicitation because it ignores "minimum" and "at least" by shifting the focus to a purported industry understanding of 36 inches. But the VA simply is not procuring 36-inch beds, it is procuring beds that are a "minimum" of 36 inches wide and some that can expand to "at least" 42 inches wide. Second, the record confirms that various manufacturers make beds with varying widths, meaning that the VA had to provide clear requirements rather than rely on an amorphous, self-serving assertion that being over 35 inches wide and expanding to more than 41 inches is good enough. That is what the VA did. Third, even if Joerns' interpretation was reasonable, the disparity between Joerns' view and the plain text of the solicitation is so great and obvious from the face of the solicitation that Joerns' failure to protest before the submission of proposals waives its argument. And finally, even if the court were to accept Joerns' argument, Joerns could not show prejudice because the beds it submitted failed to meet the standard Joerns insists should apply.

Perhaps sensing that it would not prevail with its interpretive argument, Joerns throws in a Hail Mary. Joerns contends that the VA selected beds that do not qualify as commercial products and therefore are ineligible for award in this commercial product procurement under FAR Part 12. But the record simply does not support Joerns' argument, which Joerns bases on attorney argument and hearsay.

In the end, there is no reason that the VA cannot procure the beds it has asked for since the start of this procurement. As a result, the court denies Joerns' motion for judgment on the administrative record and grants the United States' cross-motion for judgment on the administrative record.

## I.    Background

### A.    Pre-Solicitation Research

In 2024, the Veterans Health Administration, Prosthetic & Sensory Aids Service identified a need for "Hospital Beds for Home Use w/Accessories." Tab 13, AR 106. These beds are intended for use by elderly or disabled veterans being cared for outside of a hospital in a community care or home setting. *Id*. The Department of Veterans Affairs ("VA") formed an Integrated Project Team ("IPT"), comprised of various government stakeholders and clinical subject matter experts ("SMEs"), to "develop[] minimum technical requirements, acquisition plan, source selection plan, and evaluation criteria, as well as perform[] and document[] the technical evaluation." Tab 3, AR 11.

The VA began with market research to determine "the most suitable approach" to satisfy its needs. Tab 11, AR 53. It kicked off this effort with an in-person "Industry Day" on June 24, 2024, where thirteen hospital bed manufacturers showcased their beds to SMEs. *Id.* at 63-64.

Then, on November 1, 2024, the VA posted an RFI notice to SAM.gov to solicit industry feedback on its draft Minimum Technical Requirements ("MTRs"). Tab 7, AR 38-39. Relevant here, draft MTR 1 laid out the physical dimension requirements for the two types of beds that the VA was seeking:

> Upgraded Electric Bed Frame with minimum length of 80 inches
> and width of 36 inches; Bed must have the ability to adjust both
> length (up to at least 84 inches) and width (up to at least 42
> inches); Bed must be able to accommodate bed side rails (no
> mattress)
>
> Basic Electric Bed Frame Model should be made available meeting
> 80″ x 36″ that does not require adjustable capability (no mattress)

Tab 8, AR 41-42.[2]  Five vendors commented on MTR 1.  One vendor, [ * * * ], recommended a "minimum width of *35 inches* to align with industry standards" and "avoid unnecessary restrictions that could limit competition."  Tab 6 (emphasis added).  Joerns had different concerns, suggesting that "[t]he Upgraded Bed Frame and the Basic Electric Bed Frame be listed as separate MTRs and CLINs."[3]  *Id*.  Notably, Joerns did not identify any conflict between the bed width requirements and industry norms.  Rather, Joerns itself agreed that MTR 1 requires a "minimum width of 36 inches" and an adjustable width "up to at least 42 inches."  *Id.*

Based on the market research, the Contracting Officer felt "confident. . . that there w[ould] be 2 or more Small Businesses that provide acceptable proposals."  Tab 11, AR 64.  Thus, the VA concluded that its desired hospital beds were "available in the commercial marketplace" and recommended that the solicitation be a small business set-aside.  Tab 13, AR 106.

## B.    The Solicitation

On February 5, 2025, the VA issued Solicitation No. 36C10G25R0011 ("Solicitation"), titled "Hospital Beds for In Home Use."  Tab 19, AR 161.  It was designated as a total small business set-aside under the Federal Acquisition Regulation ("FAR") Part 12's procedures.  *Id.* at AR 161, 210; Tab 25 at AR 435, 486.[4]  The VA would consider four factors when evaluating offers: (1) Technical, (2) Past Performance, (3) Socio-economic, and (4) Price.  Tab 19 at AR 218; Tab 25 at AR 494.  Because this protest involves only the technical evaluation, the court does not delve into the remaining factors.

The technical evaluation was to proceed in two phases.  In Phase 1, the VA evaluated commercial product literature to determine whether the proposed beds preliminarily satisfied all

---

[2] The administrative record contains a pdf printout of the SAM.gov website posting that includes a link to the draft MTRs.  *See In Home Hospital Beds*, SAM.gov, https://perma.cc/2RR2-4G8J.  It is unclear why the draft MTRs themselves are not included in the administrative record as they plainly belong there.  Based on the parties' arguments about them, *e.g.*, ECF No. 32 at 5 & n.3; ECF No. 36 at 9-10, the court considers the draft MTRs to be incorporated in Tab 8 and properly before the court as part of the administrative record.

[3] A CLIN is a contract line item.

[4] The VA issued two amendments to the solicitation.  *See* Tab 21, Tab 24.  For ease of reference in the background section, the court provides citations to both the original solicitation, Tab 19, and the final solicitation, Tab 25, for all terms unchanged by these amendments.

MTRs.  Tab 19 at AR 219-20; Tab 25 at AR 495-96.  Only beds that passed Phase 1 would be considered acceptable for a physical evaluation conducted in Phase 2.  Tab 19 at AR 220; Tab 25 at AR 496.  If a bed did not "meet MTRs (literature review) and/or physical inspection as specified, the proposal w[ould] be considered non-responsive and eliminated from further consideration."  Tab 19 at AR 219; Tab 25 at AR 496.  In other words, a bed would be disqualified if the VA determined that it failed to satisfy any MTR at any point of the technical evaluation.

MTR 1 in the Solicitation was materially identical to the draft version posted in November 2024, although it did adopt Joerns' suggestion to split the requirement into MTR 1a for the "Advanced Electric Bed Frame" and MTR 1b for the "Basic Electric Bed Frame."  Tab 19 at AR 221; Tab 25 at AR 497.  But the substance of MTR 1's width requirements remained unchanged—still requiring a "minimum . . . width of 36 inches," and adjustable width "up to at least 42 inches."  Tab 19 at AR 221; Tab 25 at AR 497.  The Solicitation further provided that the entirety of the Phase 2 evaluation for MTR 1 would be the "[p]hysical measurement of bed frame length and width using tape measure with bed in supine position."  Tab 19 at AR 221; Tab 25 at AR 497.

In addition to the MTRs, the Solicitation required that the proposed beds comply with two International Electrotechnical Commission ("IEC") standards addressing the safety and performance of electrically powered medical beds used in home-healthcare environments.  Tab 19 at AR 168; Tab 25 at AR 442.  The solicitation did not incorporate any other industry standards.

The VA received 118 questions in response to its posting of the Solicitation.  Tab 23.  Only one vendor, [ * * * ], raised concerns regarding the bed's width requirement and whether the bed could be maneuvered through doorways:

> **Question 100:**  Does the stated 36" minimum width refer to the bed deck or the overall bed width?  A 36" bed deck typically results in an overall width exceeding 40" due to siderails and other features.  Given standard interior door widths (30-32") and even exterior door widths (typically 36", sometimes smaller in older homes), how will these beds be maneuvered through doorways?
>
> **Response: The bed width refers to the bed deck.**

*Id*. at AR 428 (emphasis in original).

On March 4, 2025, the VA issued Amendment 1 to the solicitation modifying eight MTRs in response to questions.  Tab 22 at AR 321-24.  But MTR 1 was not among the revised provisions.  *Id*. at AR 321.  The VA issued Amendment 2 on March 5, 2025, but MTR 1 again remained unchanged.  Tab 25 at AR 444.

C.      **Technical Evaluation**

Eleven offerors submitted proposals in response to the VA's Solicitation.  Tab 40.  The VA eliminated seven offerors after the Phase 1 literature review for failing to comply with

4

various requirements. *Id.* Relevant here, five offerors were found to have failed MTR 1a by proposing Advanced Beds that were only 35 inches wide. *Id.* at AR 4023 ([ * * * ]), 4024 ([ * * * ]), 4026 ([ * * * ]), 4030 ([ * * * ]), 4035 ([ * * * ]). Joerns and three other offerors were deemed to have preliminarily satisfied the MTRs and thus proceeded to Phase 2. *Id.* at AR 4022.

The VA conducted its Phase 2 evaluation at the National Acquisition Center from May 20 through May 22, 2025. *Id.*; Tab 69 at AR 4164. Three out of the four surviving offerors proposed a bed manufactured by Joerns. Tab 56 at AR 4104 (Joerns); Tab 57 at AR 4110 ([ * * * ]); Tab 58, AR 4116 ([ * * * ]). Only [ * * * ] provided a non-Joerns product, offering the [ * * * ] bed manufactured by [ * * * ] instead. Tab 55 at AR 4098; Tab 30a.

The VA determined that all three offerors providing a Joerns-made bed—Joerns, [ * * * ], and [ * * * ]—failed to meet both MTR 1a and 1b.[5] Tab 69 at AR 4178-215. The agency measured each of these beds at *34.5* inches wide for the Basic Bed and *41.5* inches wide for the Advanced Bed (1.5 inches short of the 36-inch and 42-inch minimum width requirements). *Id.* at AR 4179, 4191, 4204-05. [ * * * ]'s [ * * * ] bed, on the other hand, was measured at 36 inches wide for the Basic Bed and 42 inches wide for the Advanced Bed. *Id.* at AR 4165-66. Ultimately, the VA determined that the [ * * * ] bed complied with all MTRs and was thus the sole surviving offeror after Phase 2. *Id.* at AR 4164-77. The VA notified the unsuccessful offerors on May 27, 2025. Tabs 70-72.

### D.    Procedural History

On June 6, 2025, Joerns filed a bid protest at the Government Accountability Office ("GAO"). Tab 79. Joerns' then filed a supplemental protest three days later, arguing that (1) the VA acted unreasonably by applying unequal evaluation standards and failing to interpret the solicitation's requirements "in light of well-established commercial industry standards," and (2) the VA's award relied upon unreasonable and unsupported evaluated weaknesses in Joerns' proposal. *See* Tab 82 at AR 4520. The GAO denied the protest on September 9, 2025, concluding that the agency reasonably evaluated Joerns' proposal and Joerns failed to establish that the agency applied unequal evaluation standards. Tab 95. Joerns then filed this protest.

## II.    Jurisdiction and Standard of Review

This court has jurisdiction to hear this action under 28 U.S.C. § 1491(b)(1). The court reviews agency procurement decisions under the standards of 5 U.S.C. § 706. 28 U.S.C. § 1491(b)(4). Among the standards applied are whether the agency's decisions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).[6] In the context of a bid protest, an agency award "may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi*

---

[5] [ * * * ] and [ * * * ] also failed MTR 16, requiring battery backup functionality, which is an independently sufficient basis for disqualification. Tab 69 at AR 4199, 4212.

[6] While § 706(2)(A) is the most cited part of the standards under § 706, there are additional standards as well. *See* 5 U.S.C. §§ 706(2)(B)-(F).

*v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citations omitted).  For the first category, the test is "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion."  *Id.* at 1333 (quoting *Latecoere Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)).  As to the latter category, the violation must be "clear and prejudicial."  *Id.*  And to establish prejudice, the protester must show that there was a "substantial chance it would have received the contract award but for that error."  *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996).

Rule 52.1 provides that any party before this court "may move for partial or other judgment on the administrative record."  RCFC 52.1(c)(1).  The rule is "designed to provide for trial on a paper record, allowing fact-finding by the trial court."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).  "Unlike a motion for summary judgment, a genuine dispute of material fact does not preclude a judgment on the administrative record."  *Sparksoft Corp. v. United States,* 167 Fed. Cl. 694, 700 (2023) (citing *Bannum, Inc.*, 404 F.3d at 1354).  Thus, "[i]n deciding cross-MJARs, this court considers 'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on evidence in the record."  *Golden IT, LLC v. United States*, 117 Fed. Cl. 118, 132 (2025) (quoting *XOtech, LLC v. United States*, 950 F.3d 1376, 1380 (Fed. Cir. 2020)).

## III.    Discussion

### A.    The Solicitation's Requirements That Beds Be a "Minimum" of 36 Inches Wide and Expandable to "At Least" 42 Inches Wide Are Unambiguous.

#### 1.    Framework for Determining Whether a Solicitation is Ambiguous

This court interprets solicitations using the same principles that govern contract interpretation.  *Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1344 (Fed. Cir. 2021).  Thus, the court begins with the plain language.  *Banknote Corp. of America, Inc. v. United States*, 365 F.3d 1345, 1353 (2004).  The court's task is to "consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions."  *Id.*  (citing *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003)).  A solicitation is ambiguous "only if its language is susceptible to more than one reasonable interpretation."  *Id.* (citing *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed. Cir. 1996)); *see also Cmty. Heating & Plumbing Co., Inc. v. Kelso*, 987 F.2d 1575, 1578-79 (Fed. Cir. 1993) ("[C]ontracts are not necessarily rendered ambiguous by the mere fact that the parties disagree as to the meaning of their provisions.") (citations omitted).  Put differently, ambiguity requires that a solicitation is "susceptible of two different interpretations, each of which is found to be consistent with the [solicitation's] language."  *Western States Const. Co., Inc. v. United States*, 26 Cl. Ct. 818, 825 (1992) (citations omitted).

If a contract provision is "clear and unambiguous" on its face, this court generally cannot look to extrinsic evidence to interpret its meaning.  *Bell/Heery v. United States*, 739 F.3d 1324, 1331 (Fed. Cir. 2014) (quoting *McAbee Const., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996)); *Banknote Corp.*, 365 F.3d at 1353 ("If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning; we may not resort to

6

extrinsic evidence to interpret them.") (citing *Coast Fed. Bank*, 323 F.3d at 1038).  The Federal Circuit had held that a contractor's subjective interpretation of a provision—even one grounded in industry norms—cannot create an ambiguity where none exists in the text.  *See R.B. Wright Constr. Co. v. United States*, 919 F.2d 1569, 1571-72 (Fed. Cir. 1990) ("Neither a contractor's belief nor contrary customary practice . . . can make an unambiguous contract provision ambiguous, or justify a departure from its terms.").

That said, the Federal Circuit also has recognized that courts may "consult evidence of trade practice and custom to show that 'language which appears on its face to be perfectly clear and unambiguous has, in fact, a meaning different from its ordinary meaning.'"  *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 751 (Fed. Cir. 1999) (quoting *Gholson, Byars, and Holmes Constr. Co. v. United States*, 173 Ct. Cl. 374, 395 (1965)).  A party may rely on trade usage to show that a provision has a "special meaning within the industry," such that it was "legitimately interpreted in a way different than a layman's reading," thereby rendering the provision ambiguous.  *Western States Constr. Co.*, 26 Cl. Ct. at 824*; accord Metric Constructors*, 169 F.3d at 752.  But trade usage evidence "is not an avenue for a party to avoid its contractual obligations by later invoking a conflicting trade practice."  *Metric Constructors*, 169 F.3d at 752.  A party cannot, for example, invoke such evidence if a provision "was not reasonably susceptible of differing interpretations at the time of contracting."  *Id.*  If a solicitation is ambiguous, the court must determine whether a protestor waived its argument by failing to protest before the submission of proposals:

> [A] party who has the opportunity to object to the terms of a
> government solicitation containing a patent error and fails to do so
> prior to the close of the bidding process waives its ability to raise
> the same objection subsequently in a bid protest action in the Court
> of Federal Claims.

*Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007).  Similarly, "where a government solicitation contains a patent ambiguity, the government contractor 'has a duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation' in a subsequent action against the government."  *Id.* (quoting *Stratos Mobile Networks USA, LLC v. United States*, 213 F.3d 1375, 1381 (Fed. Cir. 2000) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996))).  Thus, "assuming that there is adequate time in which to do so, a disappointed bidder must bring a challenge to a solicitation containing a patent error or ambiguity prior to the award of the contract."  *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012).  Otherwise, the argument is waived.  *Blue & Gold*, 492 F.3d at 1313.  This waiver rule applies "to all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so."  *COMINT Sys. Corp*, 700 F.3d at 1382.

*Blue & Gold* does not apply to latent ambiguities.  *G4S Secure Integration LLC v. United States*, 161 Fed. Cl. 387, 406 (2022).  A patent ambiguity is "an obvious omission, inconsistency or discrepancy of significance."  *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1312 (Fed. Cir. 2016) (quoting *E.L. Hamm & Assocs., Inc. v. England*, 379 F.3d 1334, 1339 (Fed. Cir. 2004)).  A latent ambiguity, by contrast, is a "hidden or concealed defect which is not apparent

7

on the face of the document" and "could not be discovered by reasonable and customary care." *Id.* (quoting *Analytical & Rsch. Tech, Inc., v. United States*, 39 Fed. Cl. 34, 46 (1997)).

### 2.    The Solicitation is Unambiguous

With these principles in mind, the court turns to the solicitation's plain language.  In its final form, MTR 1 provides the minimum length and width of the beds the VA will accept:

> **MTR 1a. Advanced Electric Bed Frame** with minimum length of 80 inches and width of 36 inches; Bed must have the ability to adjust both length (up to at least 84 inches) and width (up to at least 42 inches); Bed must be able to accommodate bed side rails (no mattress).

> **MTR 1b. Basic Electric Bed Frame** Model should be made available meeting 80″ x 36″ that does not require adjustable capability. (no mattress)

Tab 25 at AR 444.  At the outset, the court recognizes that "minimum" and "at least" appear only in MTR 1a.  Throughout their briefs, both parties refer to MTR 1's minimum width requirements as applying to the Basic beds as well.  *E.g.*, ECF No. 31 at 23-25 (Joerns making contentions about bed sizing standards without differentiating between MTR 1a and 1b).  Because neither party argues that "minimum" does not apply to the Basic Bed dimensions under MTR 1b, any such argument is forfeited.

The Government's interpretation is reasonable—it asserts that the Solicitation means exactly what it says.  When addressing the width of the beds, the Solicitation requires that they be a "minimum . . . width of 36 inches" and the Advanced Bed be adjustable to "at least 42 inches." [7]  As the Government observes, it does not say that the beds must be "approximately 36 inches wide, nominally 36 inches wide, or almost 36 inches wide."  ECF No. 32 at 2.  Because the Government's interpretation is based on the Solicitation's plain language and gives meaning to all its provisions, it is reasonable.  *See generally Banknote Corp.*, 365 F.3d 1345.  Joerns does not argue otherwise.

Joerns argues that its interpretation is also reasonable; it presents a competing interpretation based on trade practice.  The thrust of its argument is that the Solicitation is ambiguous because there is a "commercial industry standard on bed width . . . under which a width-standard of '36 inches' does not literally mean '36 inches.'"  ECF No. 31 at 23.  Much like two-by-four lumber, Joerns claims that "the electronic hospital bed industry uses standardized sizing terminology—such as such as a '36″ by 80″ bed' or '42″ by 84″ bed'—with the shared understanding that the actual measurements will only *nominally comply* to the standardized sizing references."  *Id.* at 15 (emphasis added); *see also* ECF No. 30 at 5 n. 1.  In other words,

---

[7] Although the Solicitation also included length requirements, none of the beds failed to meet those requirements.  So the discussion focuses only on the width requirements.

due to a "special industry meaning" for 36″ by 80″ hospital beds, MTR 1's width requirements were ambiguous in the eyes of commercial vendors. But this is not a reasonable interpretation.

>    a)    *Joerns' Interpretation Disregards "Minimum," "At Least," and the Phase 2 Tape Measure Evaluation*

To begin with, Joerns' interpretation of the Solicitation renders meaningless the words "minimum" and "at least" in MTR 1. The Solicitation did not ask for "36″ by 80″" beds—it called for beds that are a "minimum" of 36 inches wide, and for the Advanced Bed to be adjustable to "at least" 42 inches wide. Joerns' reading provides these two qualifying phrases with no meaning. Rather than addressing the elephant in the room, Joerns asks the court to look the other way. For example, Joerns asserts that "[r]eferences throughout the Government's brief to a 'minimum required width' of 36 inches[,] as though the word 'minimum' governed the rest of the sentence[,] does not change the fact that standardized sizing governs the commercial industry's expectations." ECF No. 34 at 5. Joerns similarly argues that "[t]he issue is not . . . in 'minimum' or 'at least,'. . . [t]he issue is in 36 inches." ECF No. 38, Tr. at 62:8-10. But the court must give effect to *all* terms of the Solicitation; it cannot rewrite "minimum" and "at least" to mean "approximately" or "about." Thus, even assuming "36″ by 80″" carries some special meaning in the hospital bed industry, Joerns' interpretation is unreasonable because the Solicitation does not ask for "36″ by 80″" beds, it asks for beds with "minimum" dimensions. Joerns cannot square its interpretation with the Solicitation's clear terms.

To illustrate the point, take Joerns' two-by-four analogy. *See* ECF No. 34 at 10. It is true that in the lumber industry, a piece of lumber advertised as 2″ x 4″ is, in fact, 1.5″ x 3.5″. *Id.* (citing Oliver J. Curtis, *Nominal Versus Actual: A History of the 2x4*, Harv. Design Mag, https://perma.cc/F9BX-RB3P). If a hypothetical solicitation asked for one hundred pieces of 2″ x 4″ lumber, without more, a bidder could reasonably understand the requirement to incorporate nominal dimensions consistent with industry practice. That bidder could go to a lumber yard and buy commercial 1.5″ x 3.5″ lumber and satisfy the requirement. But if the solicitation asked instead for one hundred pieces lumber that are a "minimum" of or "at least" 2″ x 4″, the 1.5″ x 3.5″ lumber would not cut it. This is because the words "minimum" and "at least" foreclose reliance on the industry's standard dimensions of two-by-fours. In this hypothetical, just as is the case here, the solicitation's precise requirements displace industry norms concerning nominal dimensions (to the extent they exist)—not the other way around.

Further, any notion that a bed less than 36 inches wide complied with the Solicitation does not survive the fact that the Phase 2 evaluation for MTR 1 was a tape measure verification of the bed dimensions. This evaluation consisted entirely of the "[p]hysical measurement of bed frame length and width using tape measure with bed in supine position." Tab 25 at AR 497. As the GAO observed, if MTR 1 required only "nominal" compliance based on an "amorphous" standard, it necessarily would have specified a permissible range for the tape measure evaluation—*e.g.*, "36″ ± 0.125.″" *See* Tab 95 at AR 6094 n. 5, AR 6096. Otherwise, how close is close enough? Is a bed that is 35.8 inches wide close enough? Does 35.4 inches cut it? Nobody knows—and that is precisely the problem. An offeror whose bed is 35.8 inches could well come to court and argue that the "industry standard" is within a quarter inch (protestors are known to make opportunistic arguments). Of course, various companies proposed beds that were 36 inches, some 35 inches, some in between, and some less than 35 inches. In other words,

the purported industry standard is variability.  *E.g.*, ECF No. 31 at 5 n.3 ("Although hospital bed sizes are standardized, each manufacturer may offer slightly different measurements.") (quoting Jordan McElwain, *Hospital Bed Dimensions: Your Guide to Choosing the Right Size at Home*, Chapter (Dec. 30, 2024), https://perma.cc/6GWY-A7YF).  In that environment, if the VA determined that *any* proposed bed failed MTR 1 in Phase 2—i.e., that its dimensions fell outside some undefined "nominal" range—it would necessarily be relying on unstated evaluation criteria.  That would be unlawful.  *See*, *e.g.*, *Banknote Corp.*, 56 Fed. Cl. at 386 ("It thus is beyond peradventure that the government may not rely upon undisclosed evaluation criteria in evaluation proposals . . . .") (citing *Acra, Inc. v. United States*, 44 Fed. Cl. 288, 293 (1999)).

Joerns' reply that the use of the tape measure does not undermine its argument because "[t]he Solicitation never says that a bed ***shall*** be exactly 36 inches wide, or it will be found technically unacceptable," ECF No. 34 at 5 (emphasis in original), is the reddest of herrings.  Of course, the Solicitation does not say the beds "shall be exactly 36 inches wide," it says that the beds will be a *minimum* of 36 inches wide—36 inches or greater.  Tab 25 at AR 444.  And Joerns' double emphasis on "shall" is curious too.  The Solicitation plainly requires the beds to be a minimum of 36 inches wide, and states that failure to meet that MTR renders a proposal unacceptable and excluded from further consideration for award.  That sounds a lot like "shall."

### b)  The Record Does Not Support That Vendors Shared Joerns' Understanding of Nominal Compliance

Joerns also contends that its interpretation was reasonable because multiple vendors were eliminated for "interpreting the MTRs *exactly the way Joerns did*."  ECF No. 31 at 23 (emphasis added).  This, Joerns argues, serves as "*prima facie* evidence that there is, in fact, a commercial industry standard on bed width . . . under which a width-standard of '36 inches' does not literally mean '36 inches.'"  *Id.*  This argument has a few problems.

Based on the record, it is far from clear that other offerors shared Joerns' interpretation of the Solicitation's width requirements.  For example, Joerns claims that four other vendors "proposed an Advanced Electric Bed Frame with Overall Bed Size dimensions of '87″ L x 36″' W,'" but were eliminated in Phase 1 because the VA found them to be 35 inches wide.  *Id.* at 23-25.  This is wrong.  All references to a 36″ wide bed in these proposals refer to the Basic Bed called the "[ * * * ]" that they offered to meet MTR 1b.  Tab 26a at AR 535 ([ * * * ]); Tab 27a at AR 673 ([ * * * ]); Tab 28a at AR 1029 ([ * * * ], which specifically identifies (in red text) this reference as addressing MTR 1b—[ * * * ]); Tab 34a at AR 2668, 2716 ([ * * * ]).  All the references to the beds being 35 inches concerned the Advanced Bed model called the "[ * * * ]" proposed to meet MTR 1a.  And it was because the proposals explicitly stated that the [ * * * ] was 36 inches wide and the [ * * * ] was 35 inches wide that each of these offerors failed to meet MTR 1a but satisfied MTR 1b.  AR Tab 40.

Counter to Joerns' assertions, the VA never determined whether these four offerors' beds were, in fact, exactly or nominally 36 inches wide because they were eliminated in Phase 1, which consisted of only a literature review.  They did not proceed to the Phase 2 tape measure

evaluation.[8]  And the fact that these four vendors submitted Advanced Beds marketed as 35 inches wide does not help Joerns either.  According to Joerns, the industry standard is that 35-inch-wide beds and 36-inch-wide beds are separate classes, and "anything above 35 [inches] would qualify as a 36-inch bed in the industry."  ECF No. 38, Tr. at 71:9-10; *see also id.* at 71:25-72:7 (The Court: "Then what's the tape measure for? Like if we are going to . . ." Counsel: "To make sure it's not a 35-inch bed your honor.").  But even under Joerns' view, these proposals were not even nominally complaint with MTR 1—as 35-inch class beds, they would have been measured between 34 and 35 inches.  Clearly, these vendors had a different understanding of what qualifies as nominal compliance.

To the extent Joerns points to [ * * * ]'s submission of a 35.8-inch-wide bed for support, this argument fails for similar reasons. Recall that, in response to Question 100, the VA responded that the *bed deck* must be 36 inches, not the overall width.  Tab 23 at AR 428.  And according to the product literature, [ * * * ] submitted a bed with a "mattress deck" that is *34.6* inches wide.  Tab 37a at AR 3371.  That would call into question whether [ * * * ] could have believed its bed complied.  Even more, under Joerns' view, a 34.6-inch-wide bed deck would not be nominally compliant with a 36-inch-wide requirement.  Tab 23 at AR 428.  It thus appears that not even [ * * * ] shared Joerns' understanding of the permissible nominal range.

Based on the product literature, only one vendor, [ * * * ], could have shared Joerns' view of this industry standard.  This is one possible inference from [ * * * ] proposing an Advanced Bed and Basic Bed with 35-inch-wide "sleep deck[s]."  *See* Tab 38a at AR 3770, 3788.  Because [ * * * ] was eliminated in Phase 1, the court cannot say whether these beds were in fact within Joerns' nominal range or not.  In any event, a single bidder sharing Joerns' view could not establish an industry standard sufficient to overcome the Solicitation's plain language.

Seemingly no one was on the same page as to the Solicitation's width requirements. Ultimately, however, none of these disappointed bidders' interpretations were reasonable since none were consistent with the Solicitation.  As analyzed above, the Solicitation used the words "minimum," "at least," and "tape measure."  Any interpretation that deletes these terms is unreasonable.

In the end, the plain reading of this Solicitation is the correct one.  There are no competing reasonable interpretations here.  The Solicitation unambiguously required beds that were a minimum of 36 inches wide and Advanced beds were adjustable to at least 42 inches wide.  By interpreting MTR 1 to allow for something less, Joerns reads a meaning into the text that the words cannot bear.

### B.    Even if Joerns' Interpretation Were Reasonable, Its Claims Still Fail.

---

[8] As for the beds that did proceed to Phase 2, that two other vendors were found to be non-compliant with MTR 1 is of no significance since Joerns itself manufactured each bed.  Tab 57 at AR 4110 ([ * * * ]); Tab 58, AR 4116 ([ * * * ]).

If the court concluded that Joerns' industry standard interpretation was reasonable, Joerns' protest would still fail for at least two reasons—(1) the resulting ambiguity would have been patent, and (2) Joerns would be unable to show prejudice.

### 1. Any ambiguity was patent.

Assuming that the Solicitation's width requirements were ambiguous, Joerns' challenge to MTR 1 would still fail under *Blue & Gold*. This is because any such ambiguity would have been patent—i.e., apparent on the face of the document—and therefore waived by Joerns' failure to raise the issue before the close of bidding. As discussed above, MTR 1's minimum dimension requirements were clear from the Solicitation's plain language. It was also confirmed by the Solicitation's use of a tape measure to ensure compliance with the minimum dimensions with no variation allowed. In other words, the Solicitation did not say that a bed could be *within an inch of* 36 inches, it said it must be *a minimum of* 36 inches. The language is glaringly different than the industry standard that Joerns asserts, showing that the ambiguity would have been patent. *H & M Moving, Inc. v. United States,* 499 F.2d 660, 671 (Ct. Cl. 1974).

Indeed, Joerns contends that [ * * * ] identified the issue in its response to the RFI it submitted in November 2024. ECF No. 31 at 16. In response to the minimum width requirements, [ * * * ] commented:

> The minimum bed frame length should be 80 inches, with a minimum width of 35 inches to align with industry standards for bed frame dimensions.
> Benefits: Specifying a 35-inch width ensures adherence to industry norms while avoiding unnecessary restrictions that could limit competition. By opting for 35 inches rather than 36 inches, the veteran's home gains flexibility, achieving a best-value solution without compromising accessibility—especially in home environments where narrower doorways are common.

Tab 6 at AR 35. Joerns reads this as proof that the VA was on notice about the industry standard of nominal sizing. ECF No. 31 at 16. It is not clear that this is what [ * * * ] was saying; it appears to have been stating that more manufacturers make beds that are 35 inches wide than make beds that are 36 inches wide. But if [ * * * ] shared Joerns' interpretation as Joerns argues, it would confirm that this argument is waived under *Blue & Gold*. Joerns cannot argue that [ * * * ] recognized that a nominally 36-inch bed was out of compliance with the Solicitation before proposals were due, but Joerns itself could not have known this. Far from being "unknowable," *G4S Secure Integration LLC v. United States*, 161 Fed. Cl. 387, 407 (2022), this alleged ambiguity was, in fact, known— at least according to Joerns. Joerns' challenges to the Solicitation's minimum sizing requirements are thus waived.

### 2. Joerns cannot establish prejudice under its view of nominal sizing.

Assuming again that Joerns' interpretation of the Solicitation was reasonable and survived *Blue & Gold*'s waiver rule, Joerns would still fail for lack of prejudice. For protests alleging that an agency procurement violated a regulation, a protester must show prejudice—i.e.,

a "substantial chance it would have received the contract award but for that error." *Alfa Laval Separation*, 175 F.3d at 1367 (quoting *Statista*, 102 F.3d at 1582). Joerns contends that "anything above 35 [inches] would qualify as a 36-inch bed in the industry." ECF No. 38, Tr. at 71:9-10. Thus, Joerns contends that its beds complied with MTR 1's width requirements under industry standards. But the record belies that contention. During the Phase 2 evaluation, the VA measured all [ * * * ] Joerns-manufactured beds and found them to be 34.5 inches wide—an entire inch and a half short of MTR 1's 36-inch requirement. Tab 69 at AR 4179, 4191, 4204-05. And a half inch narrower than Joerns' own understanding of the permissible nominal range, 35 inches or greater. Thus, accepting Joerns' interpretation, the bed it submitted was not even nominally compliant with MTR 1. Because Joerns would have been eliminated either way, it cannot show prejudice.

Joerns provides no meaningful response: "We dispute that measurement. The beds are 35 and a half, 35.4 with the allowance." ECF No. 38, Tr. at 33:22-23. And counsel explained "I mean, the client's response to the idea that the bed was 34 and a half was apoplectic. There's no way that an objective measurement—I mean, these beds are extremely uniform and the idea that they mismeasured by 0.9 inches was incredibly offensive to the client." *Id*. at 35:25-36:5. In the end, Joerns agreed that its "argument is that the measurement has to be wrong because it just can't be right." *Id*. at 94:11-13.

However offensive the VA's measurement of Joerns' beds may be to Joerns, simply arguing that the VA is wrong falls short of proving the VA's measurement is wrong, no matter how many times Joerns repeats its disagreement. In Phase 2, the VA separately evaluated Joerns beds submitted by multiple offerors and all of them failed to meet the width requirements. Tab 69 at AR 4179, 4191, 4204-05. Given this record, the court declines to find that the VA erred on all three instances simply because Joerns says so.

### C.    The VA Did Not Violate the FAR's Commercial Item Requirements.

Joerns next argues that the VA violated the Federal Acquisition Streamlining Act of 1994 ("FASA") and FAR Part 12's provisions regarding commercial product procurements. ECF No. 31 at 13-22. Joerns makes several arguments here—that the VA failed to conduct adequate market research to understand industry practice, its interpretation of the Solicitation violated that industry practice, and that its award to [ * * * ] violated the requirement to purchase a commercial item. *Id.* at 17. None is persuasive. Because the court has addressed Joerns' argument that the VA's interpretation violated industry practice above, the court does not revisit that issue here.

### 1.    The VA conducted adequate market research.

Joerns' principal argument is that the VA must not have conducted adequate market research because, had it done so, it would have discovered that a strict 36-inch width requirement conflicts with customary commercial practice. *See* ECF No. 31 at 15; ECF No. 34 at 7. This argument is both circular and baseless. Joerns does not identify any defect in the agency's methodology, data collection, or analysis. Instead, it simply asserts that the VA's research must have been inadequate because it did not lead the VA to Joerns' own understanding (albeit unstated during market research) of how the market works. This is circular: it assumes the very

premise it seeks to prove—that strict compliance with stated dimensions is inconsistent with commercial practice—and then treats the VA's failure to adopt that premise as evidence of inadequate research. But the VA conducted market research.

Start with FAR § 12.202(a),[9] which provides that "[m]arket research (see 10.001) is an essential element of building an effective strategy for the acquisition of commercial products and commercial services and establishes the foundation for the agency description of need (see part 11), the solicitation, and resulting contract." Nobody disputes that. The VA did market research in this procurement, and Joerns participated throughout the process.

Starting in 2024, the VA began the planning for this procurement by assembling the integrated project team ("IPT") and defining its various roles and responsibilities in the process. *See* Tab 3 at AR 10-18. One of the early market research efforts was an industry day at which interested manufacturers could come to the VA and discuss their hospital beds.[10] Tab 2 at AR 4-9; Tab 11 at AR 63-64. Each manufacturer got between 1 and 1.5 hours to discuss the beds they had available. Tab 2 at AR 7.

A few months after industry day, the VA posted a RFI containing the draft MTRs and "soliciting suggestions, recommendations, and comments on the MTRs." Tab 8 at AR 41. The draft of MTR 1 provided that the beds had to be a "minimum" of 36 inches wide and the Advanced Bed had to be able to extend to "at least 42 inches" wide. *See supra* Part I.A & n.1. The VA received responses from ten vendors. Of these ten vendors, only five commented on MTR 1. Tab 6 at AR 35. Recall that Joerns raised no concerns about the minimum width requirement—Joerns suggested splitting MTR 1 in two so that fixed and expandable beds were priced separately, as did [ * * * ] and [ * * * ]. *Id*. They all confirmed the "minimum" width requirement and the requirement that the Advanced Bed extend to "at least" 42 inches. Tab 6 at AR 35. How was the VA to know that these vendors did not really mean 36 and 42 inches?

Only [ * * * ] suggested changing the requirement to 35 inches to allow more competition. Tab 6 at AR 35. But this comment—read naturally—does not indicate anything about nominal sizing in the hospital bed industry; it simply states that there *could* be more competition if the required width were narrower. And read naturally, it contradicts Joerns' position because [ * * * ]'s comment would be unnecessary if it thought 35-inch beds nominally complied with a 36-inch requirement.

Finally, the VA responded to the questions and answers during the procurement. *See generally* Tab 23. In 118 questions, not one potential offeror said anything to indicate that industry practice is to advertise their beds as being wider than they are. Not one. Again, it is unclear what more market research Joerns thinks the VA should have done. Joerns does not say. It is clear, however, that the FAR did not require more.

---

[9] In Joerns' brief, it cites FAR § 12.201(a) when quoting the language of FAR § 12.202(a). *See, e.g.*, ECF No. 31 at 13.

[10] The VA limited industry day to manufacturers but allowed them to designate a distributor to present on their behalf. Tab 2 at AR 7.

2.      Joerns has not established that [ * * * ]'s bed is a non-commercial item.

Even though Joerns is ineligible for award for failing to satisfy MTR 1, it contends that [ * * * ] is also ineligible for award because the bed that [ * * * ] proposed is not a commercial product.  ECF No. 31 at 18-22.  As a result, Joerns contends that the VA must resolicit the hospital beds, meaning Joerns will then be able to compete for the requirement.  *Id.* at 22.

Although Joerns does not explain its standing to make such an argument, the court understands this argument to invoke *Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353 (Fed. Cir. 2015).  Under *Tinton Falls*, a protestor can establish standing by showing that all other offerors are similarly ineligible for the award and that the procurement would need to be rebid in a way that would allow the protestor to compete.  *Id*. at 1358-60.  It is unclear, however, that Joerns would be able to compete in a new competition because there is nothing suggesting that there is a "sufficient probability" that the VA would resolicit for a bed less than 36 inches.  *Id*. at 1360.  According to the Government, the VA would simply state more clearly that it wants a bed with a minimum width of 36 inches.  Of course, the VA determines what its needs are, not this court.  *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010).

Assuming Joerns has standing to pursue this claim, Joerns fails on the merits.  Here, the primary dispute is whether [ * * * ]'s [ * * * ] bed is a commercial product.  The FAR defines a "commercial product" to cover six categories of products, two of which are relevant here.  48 C.F.R. § 2.101 (defining "commercial product").  Joerns concedes that it has the burden to show that the [ * * * ] offerings are not commercial products.  ECF No. 34 at 18 (citing *AGMA Sec. Serv., Inc. v. United States*, 152 Fed. Cl. 706, 719 (2021)).

Joerns contends that the [ * * * ] is not a product that has been sold, leased, or licensed, or offered for sale, lease, or license to the public.  ECF No. 31 at 20; *See* 48 C.F.R. § 2.101 (subsection 1 of the definition of "commercial product").  According to Joerns, there is no publicly available information indicating that [ * * * ] has ever sold or offered to sell the [ * * * ] bed to the public.  ECF No. 31 at 20-21.  Joerns also points to the fact that the publicly available information for [ * * * ]'s [ * * * ] bed, as opposed to the [ * * * ] bed, indicates that the [ * * * ] bed is 35.5 inches wide and expandable to 41.5 inches.  *Id.*; Tab 79 at AR 4426.  Thus, Joerns contends that the [ * * * ] bed is not the same thing that is offered for sale to the public.  In the Government's view, this is pure speculation by Joerns—there is nothing indicating whether [ * * * ] does offer the [ * * * ] bed to the public and under what name it may market it.  *E.g.*, ECF No. 32 at 33.  In the end, there is not sufficient information to determine whether the [ * * * ] bed is offered or sold to the public.

Even if the [ * * * ] bed is not itself sold or offered for sale to the public, it may still qualify as a commercial product.  The Government contends that the bed would still be a commercial product because widening the [ * * * ] bed by roughly half an inch would only be a minor modification of a commercial product.  ECF No. 32 at 33.  Under the FAR, a commercial product includes products that would qualify as a commercial product (*e.g.*, sold or offered for sale to the public) but for "[m]inor modifications of a type not customarily available in the commercial marketplace made to meet Federal Government requirements."  48 C.F.R. § 2.101 (subparagraph 3(ii) of the definition of "commercial product").  And the FAR provides

15

> "Minor modifications" means modifications that do not significantly alter the nongovernmental function or essential physical characteristics of an item or component, or change the purpose of a process. Factors to be considered in determining whether a modification is minor include the value and size of the modification and the comparative value and size of the final product.

*Id.*

Joerns has failed to establish that if the [ * * * ] bed is a modification of the [ * * * ] bed, that modification was not minor, and therefore permissible under the FAR. There is no argument that widening a bed by a half inch alters the nongovernmental function of the bed. Indeed, there is nothing to suggest that the function of the bed would be changed at all by such a small change to its width, much less resulting in a significant alteration of the function. Nor is it apparent that there would be a change to the essential physical characteristics of the bed by widening the frame by a half inch to 36 inches and the extended width by a half inch to 42 inches. This is less than a 1.5% change in each dimension.

Joerns makes several attempts to show that widening the frame was not minor, but none are persuasive. First, Joerns relies on the VA's contention before the GAO that the distinction between the [ * * * ] bed and the [ * * * ] bed "is not trivial." Tab 94 at AR 6072. Joerns contends this necessarily means that any modification of the [ * * * ] bed to make the [ * * * ] bed cannot be "minor" for the purposes of the FAR definition of a commercial product. ECF No. 35 at 21. This argument seeks to compare apples to oranges. The VA's assertion to the GAO was in response to Joerns' argument that the VA treated Joerns differently than the VA treated [ * * * ]. Tab 94 at AR 6072. In that context, the non-trivial distinction referred to one bed being compliant and one not being compliant. In other words, there was no disparate treatment. *See Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020). Despite the VA recognizing that there are differences between the [ * * * ] bed and the [ * * * ] bed, those differences are not necessarily "minor" for commercial product purposes just because they are not "trivial" for disparate treatment purposes. Indeed, the FAR provides the factors for consideration when determining whether something is a commercial product and Joerns' argument does not fit within those factors.

Second, Joerns argues that widening the [ * * * ] bed would not qualify as a minor change because "[ * * * ] had to completely reengineer its bed frame dimensions, set up new manufacturing processes for the [ * * * ] beds, [and] conduct additional testing to meet IEC standards." ECF No. 31 at 21; *see also* ECF No. 34 at 20. But this is nothing more than unsupported attorney argument. When pressed during argument, Joerns provided its basis for this argument:

> The best evidence that I have for that is, along the way, we asked Joerns, look, what is it going to take to just make a 36-inch bed? Can we go to the agency and say, give us two weeks and we can make a 36-inch bed? And they said it's impossible because there's an entire supply chain, there's an entire design process, there's an

16

> entire manufacturing process.  We have to go and retool the
> machines.  We have to retest for the IEC standards every time we
> make a change to one of these beds.  It's a huge lift.

ECF No. 38, Tr. at 43:12-21.  But that is inadmissible hearsay.  Fed. R. Evid. 802.  So the court is left without anything but attorney argument based on hearsay to conclude that widening the [ * * * ] bed by a half inch would be more than a minor modification.  In other words, Joerns failed to establish that, even if [ * * * ] widened its [ * * * ] bed by a half inch—less than 1.5%—to make the [ * * * ] bed, that change was not a minor modification under FAR § 2.101.

Finally, Joerns argues that the court should not give any weight to the Government's arguments about whether any changes were minor as these are post-hoc rationalizations, arguing that none of the analysis appears in the administrative record.  ECF No. 34 at 20.  For this argument to hold water, Joerns necessarily contends that the VA had to specifically address whether specific beds were, in fact, commercial items during the procurement.  Joerns has provided no support for that assertion, and the court has not identified any prior decision of this court or the Federal Circuit addressing the issue.  The GAO, however, has rejected the argument: "there is no requirement in the FAR that agencies formally evaluate or document whether an offered item is a commercial item when using commercial item procedures, and the protester has not provided any authority for its belief that such an analysis is required."  *Nabco, Inc.*, B-293027 et al., 2004 WL 187279, at *3 (Comp. Gen. Jan. 15, 2004).  Nor is the Government seeking to assert a post-hoc rationalization, it is simply arguing that Joerns has failed to carry its burden to show that (if the [ * * * ] bed is a modified [ * * * ] bed) widening a bed by a half inch is not a minor modification under the FAR.

### D.    Because Joerns Fails to Show the VA's Evaluation Was Arbitrary, Capricious, or Contrary to Law, Its Claim Under the Implied Duty to Consider Proposals Fairly Fails

Joerns asserts that it is entitled to relief because the VA "breached the implied duty to consider Joerns' proposal fairly and honestly, *i.e.*, the implied duty of good faith and fair dealing . . . ."  ECF No. 31 at 37.  Those are, of course, two separate duties and only the first one is applicable here.  *Scott Timber Co. v. United States*, 692 F.3d 1365, 1372 (Fed. Cir. 2012) ("The [agency] could not have breached the covenant of good faith and fair dealing by its pre-award conduct because the covenant did not exist until the contract was signed.").

As for the implied duty to consider Joerns' proposal fairly and honestly, that claim fits within this court's bid protest jurisdiction under 28 U.S.C. § 1491(b)(1).  *See Blue Origin Fed'n, LLC v. United States*, 157 Fed. Cl. 74, 113 (2021) (citing *Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1332 (Fed. Cir. 2021)).  The parties agree that the standard the court applies is whether the VA's conduct was arbitrary and capricious.  ECF No. 31 at 37; ECF No. 32 at 42.  Joerns claims that, because its prior arguments establish that the VA's conduct was arbitrary and capricious, Joerns is entitled to relief for the breach of this implied duty.  ECF No. 34 at 24.  But Joerns' failure to show that the VA's conduct was arbitrary, capricious, or otherwise contrary to law means this claim fails as well.

### E.    Joerns' Challenges to Assessed Weaknesses Do Not Change the Outcome

17

Under the Solicitation, "[i]f any proposed products do not meet MTRs (literature review) and/or physical inspection as specified, the proposal will be considered non-responsive and eliminated from further competition." Tab 25 at AR 496. That is what happened to Joerns' proposal. Tab 69 at AR 4178; Tab 70 at AR 4218-19. And nothing Joerns has argued here shows that the VA's evaluation of its proposal was arbitrary, capricious, or contrary to law. That means that Joerns remains ineligible for award—regardless of any errors the VA made in assigning the weakness to Joerns' proposal. As a result, Joerns cannot establish prejudice from any of the weaknesses. *E.g.*, *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020). Therefore, the court need not address the weaknesses further.

### F.    Injunctive Relief

When deciding whether to grant injunctive relief under 28 U.S.C. § 1491(b)(2), the court must consider whether "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citation omitted). But "[a]bsent success on the merits, the other factors are irrelevant." *Info. Tech. & Applications Corp. v. United States*, 51 Fed. Cl. 340, 357 n.32 (2001), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003). As explained in detail above, Joerns has failed on the merits of each of its claims. Therefore, the court denies injunctive relief.

## IV.    Conclusion

For the foregoing reasons, the court denies Joerns' motion for judgment on the administrative record, ECF No. 31, and grants the United States' cross-motion for judgment on the administrative record, ECF No. 32. The Clerk's Office is directed to enter judgment accordingly. No costs.

It is so ORDERED.

s/ Edward H. Meyers
Edward H. Meyers
Judge
